UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

JOSEPH O'BYRNE, *et al.*,          :
                                   :
        Plaintiffs,                :     Case No. 2:19-cv-2493
                                   :
    v.                             :     Chief Judge Algenon L. Marbley
                                   :
WEYERHAEUSER COMPANY, *et al.*,    :     Magistrate Judge Elizabeth P. Deavers
                                   :
        Defendants.                :

<u>OPINION & ORDER</u>

This matter is before this Court on several of the parties' motions, chief among them being Defendants' Motions for Summary Judgment. (ECF Nos. 91, 110, 111). In addition, this Court addresses numerous Motions to Exclude filed by Plaintiffs and Defendant Weyerhaeuser Company ("Weyerhaeuser"). (ECF Nos. 101–106, 113–116).

Pursuant to the following analysis, Defendants Westport Homes Inc.'s ("Westport") and Weyerhaeuser's Motions for Summary Judgment (ECF Nos. 91, 110) are **GRANTED in part and DENIED in part**. Defendant BluSky Restoration Contractors, LLC's ("BluSky") Motion for Summary Judgment (ECF No. 111) is **DISMISSED**. Furthermore, the parties' Motions to Exclude (ECF Nos. 101–106, 113–116) are all **DENIED**.

**I. BACKGROUND**

Westport is a semi-custom builder of residential homes in Indiana and Ohio.[1] (ECF No. 91-1 at ¶ 7). As a semi-custom builder, Westport sells real estate and constructs individualized homes to match a buyer's specific needs, preferences, and personal style. (*Id.*, ¶ 8). Westport

---

[1] "Westport is a corporation formed and organized under the laws of the State of Indiana, with its principal place of business in Indianapolis, Indiana. [It] is registered . . . with the Ohio Secretary of State's office and has appointed CT Corporation Systems as its registered agent in Ohio." (*See* ECF No. 26 at ¶ 15).

contracts for the complete construction of a home, and buyers are choosing their homesite, style of home, as well as finishes and the like. (*Id*.). Between August 2016 and May 2017, Westport entered into Purchase Agreements to construct homes for Plaintiffs[2] in Pickaway and Fairfield Counties, Ohio. (ECF No. 26 at ¶ 16).

- Plaintiffs Joseph and Sara O'Byrne executed a Purchase Agreement with Westport for the construction of a home in Pickaway County on August 27, 2016;

- Plaintiffs Eric Snyder and Brandie Hardin executed a Purchase Agreement with Westport for the construction of a home in Pickaway County on August 20, 2016;

- Plaintiffs Mark Fegan and Lisa Roberts executed a Purchase Agreement with Westport for the construction of a home in Pickaway County on November 28, 2016;

- Plaintiffs Paul and Jennifer Bahler executed a Purchase Agreement with Westport for the construction of a home in Pickaway County on August 29, 2016;

- Plaintiffs Stephen and Catherine Davies executed a Purchase Agreement with Westport for the construction of a home in Pickaway County on August 21, 2016;

- Plaintiffs Luke and Shasta Preston executed a Purchase Agreement with Westport for the construction of a home in Pickaway County on November 22, 2016;

- Plaintiffs Charles and Cindy Howell executed a Purchase Agreement with Westport for the construction of a home in Pickaway County on November 14, 2016;

- Plaintiffs John and Patricia Williams executed a Purchase Agreement with Westport for the construction of a home in Fairfield County on May 21, 2017.

(*Id*., ¶¶ 1–10).

Each Purchase Agreement contained several warranty provisions. First, the Purchase Agreements expressly warranted that the "[c]onstruction work shall be done in a workmanlike manner as defined by Ohio Law and in conformity with the rules promulgated under Ohio Revised Code Chapter 4722 and with all local, state and national codes having jurisdiction over the Home

---

[2] Westport entered also entered into Purchase Agreements with Robert and Elizabeth Wycoff as well as with Timothy and Lauren Miller. (ECF No. 26 at ¶¶ 8, 9). While the Wycoffs were originally parties to this action, Plaintiffs stipulated to their dismissal on September 16, 2020. (ECF No. 57). Additionally, at oral argument (ECF No. 148), Plaintiffs' counsel represented that the Millers also have withdrawn their claims against Defendants.

. . . ." (*See* ECF Nos. 91-2, 91-4, 91-6, 91-8, 91-10, 91-12, 91-14, 91-16 at ¶ 2). The Purchase Agreement further detailed additional limited warranties on the home, that were provided by the Quality Builders Warranty[3] ("QBW") Home Buyers Warranty. (*Id.*, ¶ 21). The QBW Warranty provides a ten-year warranty on structural defects, but contains exclusions regarding certain "damages, losses, deficiencies or defects[.]" (ECF No. 91-18 at 2). The Purchase Agreement also contained a "Limited Warranty" provision, which provided that "[f]or a violation of an act prohibited under Ohio Revised Code sections 4722.02, 4722.03, or 4722.04[,] Buyer may rescind this Agreement under certain circumstances or recover the Buyer's actual economic damages plus an amount not to exceed $5,000.00 in non-economic damages." (ECF Nos. 91-2, 91-4, 91-6, 91-8, 91-10, 91-12, 91-14, 91-16 at ¶ 15(d)). Finally, the Purchase Agreement explained that "[t]he warranties provided . . . shall be the sole express warranties provided by builder to owner relative to the work." (*Id.*, ¶ 21).

Following the execution of each Purchase Agreement, Westport began construction of Plaintiffs' homes. (ECF No. 91 at 6). As part of the construction process, Westport erected each homes' framing, including placing floor joists. (*Id.*). Westport ordered the floor joists from Defendant Weyerhaeuser, through its supplier Strait & Lamp Lumber.[4] (*Id.* at 7). Weyerhaeuser manufactures and sells wooden joists, used to frame a home's floors and to support the subfloor system. (ECF No. 133 at 2). To comply with building code fire retardant and fire protection standards, and reduce the overall flammability of the joists, Weyerhaeuser developed "Flak Jacket" coating for the joists. (*Id.*). The version of this coating used in Plaintiffs' homes contained a

---

[3] "Quality Builders Warranty Corporation . . . administers a program whereby homebuilders registered with QBW enroll homes they construct in the program. Although homeowners are responsible for the regular maintenance of the newly-constructed home, this program allows Builders to warrant that the new home will be free from specified deviations from the Warranty Standards set forth in [the QBW warranty] . . . and from structural defects as defined in [the QBW warranty] . . . ." (ECF No. 91-18 at 4).

[4] Strait & Lamp Lumber is not a party to this lawsuit.

formaldehyde-based resin. (*Id*.). Plaintiffs allege this coating renders the joists defective, as they release formaldehyde in excess of acceptable levels. (*Id*.). The framing of Plaintiffs' homes was completed and approved by the local building authority by May 2017. (ECF No. 91 at 7). Thereafter, construction was completed, and Plaintiffs began moving into their respective homes. (*Id*. at 8). All Plaintiffs had moved into their new homes by July 24, 2017. (*Id*.).

The parties dispute when Westport and Weyerhaeuser learned of the formaldehyde off-gassing issue. Regardless, on July 18, 2017, Weyerhaeuser issued a press release acknowledging that "recent customer feedback regarding an odor in certain newly constructed homes [was] related to a recent formula change to the Flak Jacket coating that included formaldehyde-based resin." (*Id*. at 9). Once Westport identified the affected homes, "it prepared two separate notices to send: one to homeowners who[] . . . had already closed on their homes, and one to homeowners whose homes were still under construction." (*Id*. at 10). The letter informed homeowners of the off-gassing issue and explained that Weyerhaeuser would remediate the allegedly defective joists. (*Id*.).

Weyerhaeuser provided Plaintiffs with three different options for remediation.[5] (ECF No. 134-38 at 14). Plaintiffs selected the remediation method they preferred, and Weyerhaeuser coordinated with its subcontractor BluSky to complete the remediation. (ECF No. 26 at ¶ 39). In fall of 2017, Plaintiffs evacuated their homes and the remediations began. (ECF No. 133 at 13–16). The remediation included mechanically removing most of the formaldehyde coating from the joists and applying a remedial topcoat further to reduce off-gassing. (ECF No. 134-38 at 14). Weyerhaeuser covered the cost of alternative lodging and provided Plaintiffs with daily stipends while they were out of their homes. (ECF No. 91 at 11). The remediations were completed between

---

[5] Weyerhaeuser provided builders and homeowners with three remediation methods, (1) replacing the Joists, (2) mechanically removing at least 95% of the Flak Jacket from the Joists and then applying a remedial topcoat to further reduce formaldehyde emissions, or (3) applying the remedial topcoat to encapsulate the Flak Jacket and reduce formaldehyde emissions. (*See* ECF No. 134-38 at 14). Each Plaintiff selected the second option. (ECF No. 133 at 13).

approximately November 2017 and February 2018, after which Plaintiffs moved back into their homes. (ECF No. 133 at 13–16). All told, Plaintiffs were living in their homes for between 51 and 159 days before evacuating—80 days on average—and were displaced from their homes for between 36 and 186 days—93 days on average. (*Id.*).

On June 14, 2019, Plaintiffs filed suit in this Court against Westport and Weyerhaeuser alleging breach of contract, unjust enrichment, breach of express and implied warranties, violations under the Home Construction Services Act ("HCSA"), violation of the Magnuson-Moss Warranty Act, and various tort law claims. (ECF No. 1). After the parties conducted discovery, this Court granted Plaintiffs leave to amend their complaint, adding BluSky and further factual allegations regarding the sufficiency of the remediation. (ECF Nos. 24, 25, 26). Westport then moved to strike Plaintiffs' jury demand, arguing the Purchase Agreements contained a waiver provision in which Plaintiffs waived the right to a jury trial in the event of a dispute arising out of the agreement. (ECF No. 29). This Court granted Westport's Motion, holding that Plaintiffs failed to meet their burden of proving they did not knowingly and voluntarily waive their right to a jury trial. (ECF No. 59).

In November 2021, each Defendant moved for summary judgment. (ECF Nos. 91, 110, 11). Plaintiffs responded to Defendants' Motions on January 10, 2022 (ECF No. 133) and Defendants replied timely (ECF Nos. 142, 143, 144), making the Motions ripe for review. While those Motions were being briefed, Plaintiffs and Weyerhaeuser also filed several Motions to Exclude. (ECF Nos. 101–106, 113–116). These Motions are also ripe for review.

## II. LEGAL STANDARD

### A. Motions to Exclude & *Daubert*

Federal Rule of Evidence 702 governs the testimony of expert witnesses. This rule reflects the Supreme Court's decisions in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579

(1993) and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999). *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 528 (6th Cir. 2008). Together, Rule 702, *Daubert*, and *Kumho Tire* establish that district courts may admit expert testimony if it satisfies three requirements. *Id*. at 528–29 (describing the district courts' responsibility "of acting as gatekeepers to exclude unreliable expert testimony"). First, "the witness must be qualified by 'knowledge, skill, experience, training, or education.'" *Id*. at 529 (quoting Fed. R. Evid. 702). Second, the testimony "must be relevant, meaning that it will assist the trier of fact to understand the evidence or to determine a fact in issue." *Id*. (quotation omitted). Third, "the testimony must be reliable." *Id*. To be relevant, expert testimony must "fit" with the issues to be resolved at trial. *Greenwell v. Boatwright*, 184 F.3d 492, 496 (6th Cir. 1999). The reliability requirement, in turn, focuses on the methodology and principles underlying the testimony. *Id*. at 496–97.

The proponent of the testimony must establish admissibility by a preponderance of the evidence. *Nelson v. Tenn. Gas Pipeline Co.*, 243 F.3d 244, 251 (6th Cir. 2001) (citing *Daubert*, 509 U.S. at 592 n.10). A district court deciding whether an expert's opinion is reliable "is not to determine whether it is correct, but rather to determine whether it rests upon a reliable foundation, as opposed to, say, unsupported speculation." *Stuckey v. Online Res. Corp.*, No. 2:08–CV–1188, 2012 WL 1808943, at *4 (S.D. Ohio May 17, 2012) (Marbley, J.).

### B. Summary Judgment

Federal Rule of Civil Procedure 56(a) provides, in relevant part, that summary judgment is appropriate "if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." In evaluating such a motion, the evidence must be viewed in the light most favorable to the nonmoving party, and all reasonable inferences must be drawn in the non-moving party's favor. *U.S. Sec. & Exch. Comm'n v. Sierra Brokerage Servs.*,

6

*Inc.*, 712 F.3d 321, 327 (6th Cir. 2013). This Court then asks "whether 'the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Patton v. Bearden,* 8 F.3d 343, 346 (6th Cir. 1993) (quoting *Anderson v. Liberty Lobby*, 477 U.S. 242, 251–52 (1986)). "[S]ummary judgment will not lie if the dispute is about a material fact that is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248. Evidence that is "merely colorable" or "not significantly probative," however, is not enough to defeat summary judgment. *Id.* at 249–50.

On a motion for summary judgment, the initial burden rests upon the movant to present the Court with law and argument in support of its motion as well as identifying the relevant portions of "'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56). If this initial burden is satisfied, the burden then shifts to the nonmoving party to set forth specific facts showing that there remains a genuine issue for trial. *See* Fed. R. Civ. P. 56(e); *see also Cox v. Ky. Dep't of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995) (finding that after the burden shifts, the nonmovant must "produce evidence that results in a conflict of material fact to be resolved by a jury"). In considering the factual allegations and evidence presented in a motion for summary judgment, the Court "views factual evidence in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor." *Barrett v. Whirlpool Corp.*, 556 F.3d 502, 511 (6th Cir. 2009). Self-serving affidavits alone, however, are not enough to create an issue of fact sufficient to survive summary judgment. *Johnson v. Wash. Cnty. Career Ctr.*, 982 F. Supp. 2d 779, 788 (S.D. Ohio 2013). "The mere existence of a scintilla of evidence to support [the non-moving

party's] position [is] insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir. 1995).

### III. MOTIONS TO EXCLUDE

Weyerhaeuser and Plaintiffs each moved to exclude several of each other's experts. Weyerhaeuser sought to exclude six of Plaintiffs experts, while Plaintiffs sought to exclude four of Weyerhaeuser's experts. While these Motions were being briefed, Plaintiffs withdrew expert designations for two of their experts—Lorraine Molnar and Robert Iezzi. (ECF No. 135). Given this representation, the motions to exclude these experts (ECF Nos. 102, 103) were not briefed.

Accordingly, as these individuals are no longer designated as experts, Weyerhaeuser's Motions to Exclude Plaintiffs' Experts Lorraine Molnar (ECF No. 102) and Robert Iezzi (ECF No. 103) are **DENIED as moot**.

#### A. Weyerhaeuser's Motions to Exclude

In four separate motions, Weyerhaeuser seeks to exclude the following of Plaintiffs' experts: Industrial Hygienist Robert Woellner (ECF No. 101); Physician/Toxicologist Dr. Tee Guidotti (ECF No. 104); Attorney William Fergus (ECF No. 105); and Physician/Toxicologist Dr. William Borough (ECF No. 106). Plaintiffs responded to each motion (ECF Nos. 129–132) and Weyerhaeuser timely replied (ECF Nos. 138–141). As such, these motions are ripe for review.

##### 1. Plaintiffs' Expert – Robert Woellner

Robert Woellner is an industrial hygienist.[6] In his employ as Plaintiffs' expert, Mr. Woellner offered two expert opinions:

1. 24 to 48 parts per billion ("ppb") of formaldehyde represents a fair and reasonable range for background levels.

---

[6] As defined by the Occupational Safety and Health Administration ("OSHA"), industrial hygiene is the "recognition, evaluation, and control of those environmental factors or stresses arising in or from the workplace, which may cause sickness, impaired health and well-being, or significant discomfort among workers or among the citizens of the community." (ECF No. 101 at 2).

2. In subject residences where occupants experienced adverse health effects, the concentrations of formaldehyde present were most likely 80 ppb or higher. In subject residences containing noticeable formaldehyde odors, concentrations were most likely 500 ppb or higher.

(ECF No. 95-3 at 7, 9). Weyerhaeuser asserts that because Mr. Woellner failed to follow "reliable principles and methods," his second opinion should be excluded. (ECF No. 101 at 3). Weyerhaeuser makes two arguments on this point. First, Weyerhaeuser maintains that Mr. Woellner inappropriately relied on the Agency for Toxic Substances and Disease Registry's ("ATSDR") medical management guidelines to conclude that because Plaintiffs claim to have smelled formaldehyde, formaldehyde concentrations in their homes must have been at least 500 ppb. (*Id*. at 4). This reliance was impermissible, says Weyerhaeuser, because "identification of odor, is extremely variable people by people," and the "proper way" to determine formaldehyde levels is to do an individualized assessment of an "olfactory sense protocol." (*Id*.). As Mr. Woellner did not conduct any such individualized assessment, Weyerhaeuser argues his opinion is unreliable. (*Id*.). Second, Weyerhaeuser argues that Mr. Woellner selectively relied on the ATSDR's guidance, and the resulting internal inconsistency in his testimony constitutes further grounds for exclusion. (*Id*. at 4–5).

Plaintiffs argue Mr. Woellner did not reject the ATSDR guidance, he simply considered it, along with many other sources, adopted some of its findings and disregarded others. (ECF No. 129 at 2). Regarding their alleged physical symptoms, Plaintiffs highlight that Mr. Woellner consulted with research from the World Health Organization ("WHO") which indicated that throat and nose irritation may occur upon single and repeated exposure to formaldehyde concentrations as low as 80 ppb. (*Id*. at 2–3). Mr. Woellner's citations to the ATSDR guidance are not inconsistent with the WHO data, argue Plaintiffs, rather "they are two different standards for two different

9

circumstances." (*Id*. at 3). Finally, Plaintiffs maintain that Mr. Woellner need not quantify every aspect of his opinion to render that opinion reliable. (*Id*. at 8 (citing *Kumho Tire*, 526 U.S. at 141)).

Weyerhaeuser takes issue with Mr. Woellner's alleged "selective reliance" on the ATSDR and WHO guidance, arguing that reliance makes his opinions unreliable. (ECF No. 101 at 3). Such critiques, of an expert's evidence gathering techniques, however, "generally go to the weight of the evidence, not its admissibility." *Little Hocking Water Ass'n, Inc. v. E.I. du Pont de Nemours & Co.*, 90 F. Supp. 3d 746, 764 (S.D. Ohio 2015) (citing *United States v. Stafford*, 721 F.3d 380, 395 (6th Cir. 2013)). Similarly, "criticism of which facts were selected or relied upon" also goes to the weight of the testimony, not its admissibility. *Stonebridge Operating Co., LLC v. Antero Res. Corp.*, No. 2:19-CV-1714, 2022 WL 2643354, at *5 (S.D. Ohio July 7, 2022). And "when such differences in interpretation rest on rational grounds–[it] is an issue more appropriately addressed on cross-examination." *Little Hocking*, 90 F. Supp. 3d at 764.

While Weyerhaeuser disputes the strength of Mr. Woellner's opinion, this Court finds that his conclusion on the formaldehyde levels in Plaintiffs' homes rests on "a reliable foundation" and not simply "unsupported speculation." *Stuckey v. Online Res. Corp.*, No. 2:08–CV–1188, 2012 WL 1808943, at *4 (S.D. Ohio May 17, 2012) (Marbley, J). The guidance from ATSDR and WHO, although conflicting in some regard, both come from sufficiently reputable sources; neither is so misleading as to constitute "junk science." *Best v. Lowe's Home Ctrs., Inc.*, 563 F.3d 171, 176–77 (6th Cir. 2009). Given this foundation, this Court finds that Mr. Woellner's opinion is sufficiently reliable. Moreover, where the reliability of the evidence is in dispute, it is more appropriate for a judge to admit the evidence than to keep it from the fact-finder because "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509

U.S. at 596. Accordingly, Weyerhaeuser's Motion to Exclude (ECF No. 101) is **DENIED** and Mr. Woellner's expert witness testimony will not be excluded.

### 2. *Plaintiffs' Expert – Tee Guidotti*

Dr. Tee Guidotti is a physician, board-certified specialist in internal, pulmonary, and occupational medicine. (ECF No. 131 at 1). Plaintiffs offer Dr. Guidotti as an expert on the symptoms of formaldehyde exposure. Dr. Guidotti offered five expert opinions:

1. Plaintiffs experienced sufficiently high exposure to formaldehyde to present a serious health risk.

2. Surveillance for medical problems arising from exposure to formaldehyde is prudent for the exposed Plaintiffs.

3. The exposure to formaldehyde experienced by Plaintiffs is consistent with an elevated risk of cancer and may be sufficient to exacerbate non-cancer outcomes such as asthma and respiratory disease.

4. The exposed Plaintiffs should be monitored with medical tests designed for early detection and intervention of formaldehyde-related cancers.

5. The protocol for this medical monitoring should be determined on the basis of best scientific knowledge and medical practice and adjusted periodically by an expert to reflect future scientific findings with respect to risk associated with formaldehyde exposure.

(ECF No. 104-1 at 8–9). Weyerhaeuser seeks to exclude Dr. Guidotti's testimony in its entirety. First, Weyerhaeuser argues that Dr. Guidotti's first opinion should be excluded because it does not have the requisite degree of certainty. (ECF No. 104 at 4). Dr. Guidotti's conclusion that Plaintiffs' exposure to formaldehyde may cause injury, says Weyerhaeuser, is not sufficiently definite to constitute admissible expert testimony. (*Id.*). Second, concerning Dr. Guidotti's second, fourth and fifth opinions, Weyerhaeuser asserts that each should be excluded because it is too conclusory, without any explanation or reliance on accepted data and methodologies. (*Id.*). Finally, Weyerhaeuser argues Dr. Guidotti's third opinion should be excluded because it is too speculative,

and not specific to any Plaintiff. (*Id*. at 5–6). Weyerhaeuser maintains that Dr. Guidotti has no way of quantifying to what extent any Plaintiff has a risk of cancer because of formaldehyde exposure. (*Id*. at 5). Throughout its Motion, Weyerhaeuser emphasizes that Dr. Guidotti did not review any of Plaintiffs' medical records or their deposition testimony. (*Id*.).

Plaintiffs argue that Dr. Guidotti reviewed the facts of this case and expressed several expert opinions to a reasonable degree of medical certainty, none of which should be excluded. (ECF No. 131). Dr. Guidotti's opinions on their risk of cancer, assert Plaintiffs, are all based on sufficient facts and data. (*Id*. at 3). Specifically, Plaintiffs maintain that Dr. Guidotti relied on the toxicological information produced by Weyerhaeuser, Plaintiffs' self-reported symptoms, as well as "peer-reviewed studies and literature on the level of formaldehyde necessary to produce each particular symptom." (*Id*.). As such, Plaintiffs argue that none of Dr. Guidotti's opinions is conclusory or speculative. (*Id*. at 4). To the latter point, Plaintiffs assert that *Daubert* does not require more than the state-of-the-art in any given field can provide. (*Id*.). And, as Dr. Guidotti offered each of his opinions (particularly those on medical causation) to a reasonable degree of medical certainty, Plaintiffs argue exclusion is inappropriate. (*Id*.).

Rule 702 requires all expert testimony be not only relevant, but reliable and certain. *Daubert*, 509 U.S. at 589. The Rule does not, however, require "anything approaching absolute certainty[,]" as "there are no certainties in science." *Tamraz v. Lincoln Elec. Co.*, 620 F.3d 665, 671–72 (6th Cir. 2010) (citing *Daubert*, 509 U.S. at 590); *U.S. v. Bonds*, 12 F.3d 540 (6th Cir.1994)("Absolute certainty of result or unanimity of scientific opinion is not required for admissibility so long as the conclusions drawn by the experts are based on generally accepted and reliable scientific principles."). Moreover, in the context of medical causation, "[a] trial court should . . . not substitute its judgment on the reliability of the medical causation testimony where

12

plaintiffs demonstrate that their experts are at least minimally qualified and give testimony which may help the jury in resolving the ultimate issues of fact. *Conde v. Velsicol Chem. Corp.*, 804 F. Supp. 972, 1019 (S.D. Ohio 1992), *aff'd*, 24 F.3d 809 (6th Cir. 1994).

This Court finds Dr. Guidotti's opinions reliable. Plaintiffs have sufficiently shown that Dr. Guidotti's conclusions have a reasonable factual basis, based on accepted methodologies and sources. Specifically, Dr. Guidotti bases his opinions on air quality tests performed by Weyerhaeuser; models for cancer risk used by the US Environmental Protection Agency ("EPA"); OSHA standards; as well as Plaintiffs' self-reported symptoms. (ECF Nos. 104-1, 112-3). While Weyerhaeuser may feel the factual bases for Dr. Guidotti's opinions are weak, that does not constitute proper grounds to exclude his testimony. *Andler v. Clear Channel Broad., Inc.*, 670 F.3d 717, 729 (6th Cir. 2012). And, considering the materials upon which Dr. Guidotti based his opinion, this Court rejects Weyerhaeuser's argument that these opinions lack any explanation or reliance on accepted data and methodologies.

Finally, this Court does not find that Dr. Guidotti's opinions are too speculative. Considering Plaintiffs' exposure to formaldehyde, as determined (in part) by Weyerhaeuser's air tests, Dr. Guidotti opined that Plaintiffs are at an elevated risk of cancer and the exacerbation of non-cancer outcomes. (ECF No. 104-1 at 8–9). This conclusion, being further supported by peer reviewed studies on the impacts of formaldehyde exposure, is not impermissibly speculative. This is not a situation where an expert opinion contains a "string" of speculations, where "the train becomes too long to pull and the couplings too weak to hold the cars together." *Tamraz*, 620 F.3d at 670. Moreover, "[w]here one party sees speculation, another sees knowledge, "which is why the district court enjoys broad discretion over where to draw the line." *Id*. at 672. Accordingly, considering given the foregoing analysis, this Court finds that the opinions of Dr. Guidotti rise

above the level of speculation for purposes of admissibility. *See Kelly v. Bare Escentuals Beauty, Inc.*, No. 2:14-CV-1359, 2017 WL 4099212 (S.D. Ohio Sept. 15, 2017).

Weyerhaeuser's Motion to Exclude (ECF No. 104) is **DENIED** and Dr. Guidotti's expert witness testimony will not be excluded.

### 3.  *Plaintiffs' Expert – William Fergus*

William D. Fergus, Jr. is an attorney whose practice focuses on real estate transactions. (ECF No. 132 at 2). Mr. Fergus has also worked for several title agencies, directly supervising title reviews and document production for real estate transactions. (*Id*. at 2–3). Plaintiffs offer Mr. Fergus as an expert on Plaintiffs' obligation to disclose the formaldehyde off-gassing should they sell their homes. (*Id*.). Mr. Fergus offered one expert opinion:

1. [U]pon entering into a contract for sale of their respective homes, under existing law Plaintiffs will be required to disclose the existence of formaldehyde gas within the premises, and the actions taken to remediate the formaldehyde gas.

(ECF No. 105-1 at 3). As part of this opinion, Mr. Fergus assumes that formaldehyde gas is a "toxic or hazardous substance." (*Id*.). Weyerhaeuser seeks to exclude this opinion, arguing that it is "pure speculation and constitutes an inadmissible legal conclusion." (ECF No. 105 at 3). To the first point, Weyerhaeuser asserts that Mr. Fergus is not qualified to opine that formaldehyde gas is a "toxic or hazardous substance," nor did he explain why he must assume as such for the purposes of his opinion. (*Id*. at 3–4). Second, Weyerhaeuser argues that Mr. Fergus' opinion on what Ohio law requires, invades the province of the court by instructing the jury on the law. (*Id*. at 4).

Citing Fed. R. Evid. 104(b), Plaintiffs argue that the Court may admit proposed evidence on the condition that the proof on which it depends be introduced later. (ECF No. 132 at 4). Plaintiffs maintain that because Mr. Fergus's assumption on the toxicity of formaldehyde is supported by other expert testimony, it is not inadmissible. (*Id*. at 5). Moreover, Plaintiffs assert

that Mr. Fergus does not intend to offer any opinion on Ohio Law or cite to any particular statute. (*Id*. at 2). Rather, say Plaintiffs, Mr. Fergus simply testifies as to his knowledge and experience in handling document production for real estate transactions. (*Id*. at 5).

"Expert testimony may not be based on mere speculation, . . . and assumptions must be supported by evidence in the record." *Rose v. Truck Centers, Inc.*, 388 F. App'x 528, 535 (6th Cir. 2010). "[W]eaknesses in the factual basis of an expert witness opinion, [however,] bear[s] on the weight of the evidence rather than on its admissibility." *Id*. This Court finds that Mr. Fergus's reliance on the assumption that formaldehyde gas is a "toxic or hazardous substance," was permissible given that Plaintiffs have introduced other sufficient, admissible evidence on the toxicity of formaldehyde. This is not a case where an expert's assumption is based on a fact, directly contradicted by undisputed evidence of record. *See e.g. Rose v. Truck Centers, Inc.*, 611 F. Supp. 2d 745, 751 (N.D. Ohio 2009), *aff'd*, 388 F. App'x 528 (6th Cir. 2010) (excluding expert opinion on the looseness of a vehicle's tires prior to an accident, where it was undisputed that the bolts were manipulated after the accident and before the expert's examination).

This Court also finds that Mr. Fergus's opinion, in its present form, does not offer any impermissible legal conclusions. While expert testimony is permitted to embrace an "ultimate issue," an expert is not permitted to testify regarding "legal conclusions" since the testimony "may convey unexpressed, and perhaps erroneous, legal standards to the jury" *U.S. ex rel. Martin v. Life Care Centers of Am., Inc.*, No. 1:08-CV-251, 2014 WL 4816006, at *3 (E.D. Tenn. Sept. 29, 2014). The Sixth Circuit has clarified that although expert opinion may embrace ultimate issues, the expert is not permitted to draw a legal conclusion and is only permitted to state an opinion "that suggests the answer to the ultimate issue or that give the jury all the information from which it can

draw inferences as to the ultimate issue." *Berry v. City of Detroit*, 25 F.3d 1342, 1353 (6th Cir. 1994).

Mr. Fergus's opinion does include some reference to legal standards. For example, Mr. Fergus opines:

> Pursuant to ORC 5302.30, all sellers of residential real property must complete the Residential Property Disclosure Form promulgated by the Ohio Department of Commerce (the "RPDF") unless a seller is exempt from the requirement pursuant to ORC 5302.30(B)(2) . . .

(ECF No. 105-1 at 3). He further opines:

> while ORC 5302.30 as interpreted by Ohio Courts does not provide a cause of action for false or incomplete disclosures, the signed RPDF can and frequently is presented as evidence in common law real estate vendor fraud cases

(*Id*.). The mere mention of these statutes, does not in itself "constitute instructing the jury on the law." *Cook v. Erie Ins. Co.*, No. 2:18-CV-00282, 2022 WL 2467528, *5 (S.D. Ohio July 6, 2022). And, while a recitation of what the statutes require would be impermissible testimony before a jury, "[t]he Court is not relying on [this] testimony to determine the correct legal standards necessary to resolve the pending Motions for Summary Judgment." *Conley v. Lakota Loc. Sch. Dist.*, No. 1:16-CV-1105, 2018 WL 4963485 (S.D. Ohio Oct. 15, 2018). Also, as detailed above, "it is often the 'better practice' to address the admissibility of evidence in context at trial." *Id*. (quoting *Sperberg v. Goodyear Tire & Rubber Co.*, 519 F.2d 708, 712 (6th Cir. 1975)).

Accordingly, Weyerhaeuser's Motion to Exclude (ECF No. 105) is **DENIED** and Mr. Fergus's expert witness testimony will not be excluded.

### 4. Plaintiffs' Expert – William Boroughf

William J. Boroughf, D.O. is a physician and medical toxicologist. (ECF No. 130 at 1). Plaintiffs offer Dr. Boroughf as an expert on medical causation (both general and specific) as well as on medical monitoring. (ECF No. 97-4). Dr. Boroughf offered four opinions:

16

1. Inhalational formaldehyde exposure is capable of causing Plaintiff's symptoms, including eye irritation, airway irritation, headaches, and nausea.

2. Plaintiffs' symptoms were caused by inhalational formaldehyde exposure.

3. Plaintiffs are at risk of long-term sequelae to their exposure, including the development of cancer.

4. Medical monitoring is required for Plaintiffs due to their residential formaldehyde exposure.

(*Id*. at 9–17). Weyerhaeuser seeks to exclude the latter three of Dr. Boroughf's opinions, arguing each is wholly deficient. Regarding the second opinion, Weyerhaeuser argues that Dr. Boroughf failed to evaluate alternative causes of plaintiffs' symptoms, relying only on the temporal link between plaintiffs' exposure to formaldehyde and their self-reported symptoms. (ECF No. 106 at 4–5). That reliance, says Weyerhaeuser, is impermissible under Sixth Circuit precedent. (*Id*. at 5 (citing *Best*, 563 F.3d at 177)). Weyerhaeuser further asserts that Dr. Boroughf's opinions on Plaintiffs' risk of cancer and the necessity of medical monitoring are inadmissible because they do not have the requisite degree of certainty. (*Id*. at 7–8). Regarding medical monitoring specifically, Weyerhaeuser maintains that Dr. Boroughf's opinion has no factual basis. (*Id*. at 8–9).

Plaintiffs assert that Dr. Boroughf's opinions were offered to a reasonable degree of medical and scientific certainty, based on his education, training, and experience. (ECF No. 130 at 1). Dr. Boroughf's opinion on specific causation, say Plaintiffs, is not based solely on temporal relationships, but rather relies on the classic Bradford Hill criteria and other standardized methodologies for determining specific causation that have been generally accepted. (*Id*. at 4–5). Moreover, Plaintiffs assert that Dr. Boroughf's opinion on Plaintiffs' increased risk of cancer is permissible given that "[t]he probability of an increased risk of developing cancer does not equate to a probability that someone will develop cancer." (*Id*. at 8). Finally, as it relates to medical monitoring, Plaintiffs argue that Dr. Boroughf did not presently contemplate or include medical

monitoring in his opinion. (*Id*. at 9). Rather, say Plaintiffs, Dr. Boroughf simply opined that Plaintiffs' increased risk for cancer justified a program of regular access to medical care so that specific kinds of symptoms, if developed in the future, can promptly be evaluated. (*Id*.).

Courts in this Circuit have recognized certain "red flags" in expert testimony, which "should cause concern for the trial court, as gatekeeper, in admitting expert scientific . . . testimony." *Downs v. Perstorp Components, Inc.*, 126 F. Supp. 2d 1090, 1125–1128 (E.D. Tenn. 1999) (citing Saltzburg, Martin & Kapra, Federal Rules of Evidence Manual, 1229–37 (7th Ed. 1998)). None of these factors is dispositive, but each has been considered as cutting against admissibility. *Id*. at 1125. These "red flags" include a reliance on temporal proximity and a failure to consider other possible causes. *Id*. at 1126–1127. Weyerhaeuser argues that Dr. Boroughf failed to evaluate alternative causes of Plaintiffs' symptoms, relying only on the temporal link between their exposure and self-reported symptoms. (ECF No. 106 at 4–5). This Court disagrees.

"Forming a conclusion on the basis of temporal proximity, *in the absence of some established scientific connection between substance and illness*, is inconsistent with the scientific method because the expert fails to consider other possible explanations . . . that a scientist would want to look into before drawing a conclusion." *Downs*, 126 F. Supp. 2d at 1126 (emphasis added). While Dr. Boroughf emphasizes the temporal link between Plaintiffs' exposure and their self-reported symptoms, he does so with "some established scientific connection between substance and illness." *Id*. Specifically, Dr. Boroughf relies on peer reviewed studies (ECF No. 97-4 at 9, n. 3, 5), data from industrial hygiene research and regulatory bodies[7] (*id*. at 10), Plaintiffs' self-reported symptoms (*id*. at 5–7), and his own experience as a physician and toxicologist (*id*. at 16). Weyerhaeuser's claim that Dr. Boroughf failed to establish an exact quantifying dose-exposure for

---

[7] These include the ATSDR, American Conference Governing Industrial Hygiene ("ACGIH"), National Institute for Occupational Safety and Health ("NIOSH"), OSHA and WHO. (ECF No. 97-4 at 10).

each Plaintiff, is misplaced. The Sixth Circuit has made clear that *Daubert* does no require "precise" or "exact" information concerning dosage or the dose-response relationship. *Adams v. Cooper Indus., Inc.*, No. CIVA 03-476 JBC, 2007 WL 2219212, at * 7 (E.D. Ky. July 30, 2007) (citing *Hardyman v. Norfolk & Western Ry. Co.*, 243 F.3d 255, 264 (6th Cir. 2001)). As detailed previously, there is little evidence in the record on the levels of formaldehyde in Plaintiffs' homes prior to remediation. Accordingly, numerous experts, including Dr. Boroughf, properly relied on Weyerhaeuser's post-remediation testing and Plaintiffs' own testimony, when opining on exposure levels. Given the availability of factual evidence in the record as well as the other sources upon which Dr. Boroughf relief, this Court does not find that Dr. Boroughf "made [no] attempt to measure the extent of [Plaintiffs'] exposure to an allegedly harmful substance." *Adams*, 2007 WL 2219212, at * 7 (excluding expert opinion on medical causation where the expert did not "attempt to quantify or measure the amount or dosage of a substance to which a plaintiff was exposed and did not rely on any other expert who did so").

Similarly, this Court does not find that Dr. Boroughf's opinions are uncertain or lacking factual support. Only where an expert's testimony amounts to "mere guess or speculation," should the Court exclude his testimony. *United States v. L.E. Cooke Co.*, 991 F.2d 336, 342 (6th Cir. 1993). "[W]here the opinion has a reasonable factual basis, it should not be excluded. Rather, it is up to opposing counsel to inquire into the expert's factual basis." *Id*. Here, as detailed above, Dr. Boroughf's opinions have a reasonable factual basis. And, while Weyerhaeuser may dispute the strength of these fact, such objections are best resolved through cross-examination. *Bonne v. Premier Athletics*, No. 3:04–CV–440, 2007 WL 3181289, at *7–8 (E.D. Tenn. Oct. 29, 2007). This Court also finds that Dr. Boroughf's opinions have the requisite degree of certainty. Absolute certainty is not required under Rule 702. *See Tamraz*, 620 F.3d at 671–72 (6th Cir. 2010). All this

19

Court must determine is whether Dr. Boroughf's conclusions are "based on generally accepted and reliable scientific principles." *Bonds*, 12 F.3d at 540. And, as detailed above, Dr. Boroughf's opinions, including those on medical monitoring, are based on peer reviewed studies and the factual evidence of record. Moreover, "[q]uestions about the certainty of the scientific results are matters of weight for the jury." *Bonne*, 2007 WL 3181289, at *7–8.

Accordingly, Weyerhaeuser's Motion to Exclude (ECF No. 106) is **DENIED** and Dr. Boroughf's expert witness testimony will not be excluded.

### B. Plaintiffs' Motions to Exclude

Plaintiffs seeks to exclude the following of Weyerhaeuser's experts: Product Safety Expert Alan Schoem (ECF No. 113); Engineer and Chemical Materials Expert Maureen Reitman (ECF No. 114); Toxicologist Paul Nony (ECF No. 115); and Certified Industrial Hygienist Renee Kalmes (ECF No. 116). Weyerhaeuser timely responded to each motion (ECF Nos. 123, 126–128), and Plaintiffs did not reply. As such, these motions are now ripe for review.

#### 1. *Weyerhaeuser's Expert – Alan Schoem*

Alan Schoem is a product safety expert. (ECF No. 112-10 at 2). Weyerhaeuser offers Mr. Schoem as an expert on the efficacy of the remediation. (*Id*.). Mr. Schoem offered four opinions:

1. Identifying the need for a recall and implementing a recall can take several months, even when the issue is significantly less complex than the formaldehyde off-gassing issue here.

2. Weyerhaeuser acted responsibly and in a timely manner to respond to the isolated, initial complaints of irritation and to identify the source of the formaldehyde off-gassing issue, the scope of the issue, and a corrective action.

3. Upon realizing the issue was more widespread, Weyerhaeuser acted responsibly and in a timely manner to take additional corrective action and to provide notice of the issue.

4. Weyerhaeuser's response to the formaldehyde off-gassing issue was timely, especially given its complexity.

(*Id*. at 4). Plaintiffs seek to exclude all of Mr. Schoem's expert opinion testimony, arguing that he impermissibly defines Weyerhaeuser's legal duties and whether it breached those duties. (ECF No. 113 at 6–7). Such testimony, say Plaintiffs, invades the province of the jury by simply telling it whose side to take on disputed issues of fact. (*Id*. at 7). Plaintiffs argue Mr. Schoem impermissibly opined on how reasonable and timely Weyerhaeuser's response was to the information that formaldehyde gas was being emitted into Plaintiffs' homes. (*Id*. at 8).

Weyerhaeuser argues that Plaintiffs have placed the reasonableness of its conduct at issue by alleging it acted recklessly and maliciously. (ECF No. 123 at 1). Weyerhaeuser asserts that Mr. Schoem's testimony provides a basis for the jury to contextualize its corporate response to the off-gassing issue. (*Id*. at 4). Weyerhaeuser further maintains that Mr. Schoem's opinions do not reach the issue of whether it breached any duty. (*Id*. at 5). Rather, Weyerhaeuser argues that Mr. Schoem compared its corporate response with that of other product remediation and recall efforts, and opined that Weyerhaeuser complied with industry standards. (*Id*. at 6–7).

Expert testimony regarding standards of care is generally permitted in situations "where the testimony is distinctively related to a profession beyond the understanding of the average layman." *In re E.I. du Pont de Nemours & Co. C-8 Pers. Inj. Litig.*, 348 F. Supp. 3d 698, 710 (S.D. Ohio 2016) (internal quotations omitted). Mr. Schoem's testimony on remediation after an exposure to toxic chemicals, is the sort of testimony "where the issues are 'so distinctly related to some science, profession or occupation as to be beyond the ken of the average layperson.'" *Id*. (quoting *Nat'l Tel. Coop. Assoc. v. Exxon*, 38 F. Supp. 2d 1, 10 (D.D.C. 1998)). Given its relevance and helpfulness, this Court finds admissible Mr. Schoem's testimony on whether Weyerhaeuser complied with industry standards during the remediation process.

Furthermore, Mr. Schoem's testimony is based primarily on his 47 years of experience as a private practitioner advising clients on product safety and product recalls. (*See* ECF No. 112-10 at 2, 4–5). Rule 702 allows for experts who are qualified based on their skills or experience.  Fed. R. Evid. 702; *see also Ty Inc. v. Softbelly's Inc.*, 353 F.3d 528, 538 (allowing witness who was an experienced business-person to be qualified as an expert on whether consumers considered toy name to be generic). Here, Mr. Schoem is qualified to discuss how Weyerhaeuser's remediation efforts compare to those of other manufacturers in similar situations based on his experience in the field. *See T. Marzetti Co. v. Roskam Baking Co.*, No. 2:09-CV-584, 2010 WL 909582, at *4 (S.D. Ohio Mar. 11, 2010) (refusing to exclude experiential expert testimony by a cooking teacher and consultant for the food industry, on the meaning of a term used in the baking industry).

Accordingly, Plaintiffs' Motion to Exclude (ECF No. 113) is **DENIED** and Mr. Schoem's expert witness testimony will not be excluded.

### 2.  Weyerhaeuser's Expert – Maureen Reitman

Maureen Reitman is an engineer and chemical materials expert. (ECF No. 112-5 at 15). Weyerhaeuser offers Ms. Reitman as an expert on the chemical and material properties of the Flak Jacket Protection as well as on the efficacy of the remediation. (*Id*. at 13). Ms. Reitman offered three opinions:

1.  In keeping with diffusion principles, the emission rate of formaldehyde is fastest shortly after application of the Flak Jacket to the Joists, and the emission levels of formaldehyde from Joists with Flak Jacket will decrease over time, even in the absence of remediation.

2.  The three remediation methods developed by Weyerhaeuser are effective, and the airborne formaldehyde, if any, from the remediated Joists in the Plaintiffs' houses is below acceptable levels.

3.  Airborne formaldehyde, if any, from the remediated joists in Plaintiffs' houses will remain below acceptable levels in the future.

(*Id*. at 14). Plaintiffs seek to exclude Ms. Reitman's opinions, arguing they are scientifically unreliable and have no bearing on the ultimate issues for trial. (ECF No. 114 at 7). Regarding reliability, Plaintiffs take issue with Ms. Reitman's reliance on WHO's indoor air quality guidelines and concentration level testing conducted by another party. (*Id*. at 1). As to Ms. Reitman's first opinion, Plaintiffs maintain that there is no dispute that the concentration levels within Plaintiffs' homes started higher and decreased over time. (*Id*. at 8–9). Similarly, Plaintiffs assert that the concentration of formaldehyde in other homes is not an issue relevant to this case, and Ms. Reitman's conclusions on those concentrations after remediation, are irrelevant. (*Id*. at 9). Lastly, Plaintiffs argue that Dr. Reitman's opinions impermissibly answer the ultimate question of the case. (*Id*. at 10–12). Plaintiffs maintain that Ms. Reitman's opinion on the effectiveness of Weyerhaeuser's remediation methods is simply an alternative way to declare that she believes Weyerhaeuser is not liable for an ongoing failure to abate the hazardous condition. (*Id*. at 11).

Weyerhaeuser first argues that Ms. Reitman based her opinions on well-established and accepted guidelines, as well as on legitimate data. (ECF No. 128 at 4–9). Arguments about the accuracy of Ms. Reitman's conclusion, says Weyerhaeuser, should be left to vigorous cross-examination, the presentation of contrary evidence, and careful instruction on the burden of proof, rather than exclusion. (*Id*. at 6). Moreover, Weyerhaeuser maintains that Ms. Reitman's conclusions on the concentration levels within Plaintiffs' homes over time, are useful for determining whether the remediation procedures used were adequate and for explaining the complex process of formaldehyde dissipation. (*Id*. at 7).  Finally, Weyerhaeuser argues that Ms. Reitman's findings do not amount to legal conclusions. (*Id*. at 9–10). Weyerhaeuser highlights that Dr. Reitman is not opining on the standard of care Weyerhaeuser exhibited when remediating,

rather she simply opines on whether the remediation methods would have brought the formaldehyde levels below one standard's threshold. (*Id*. at 10).

This Court does not find Ms. Reitman's opinions unhelpful or unreliable. First, this Court has already found that an expert's reliance on different indoor air quality guidelines, does not make their opinion inadmissible. *See supra* at Part III(A)(1). Such critiques, generally go to the weight, not admissibility. *Little Hocking Water Ass'n, Inc.*, 90 F. Supp. 3d at 764. Moreover, Ms. Reitman's reliance on the exposure testing conducted by a third-party, does not render her opinion unreliable as "experts may rely on data from others, at least to the extent that the data is of the type reasonably relied on by other experts in the field." *United States v. Roberts*, 830 F. Supp. 2d 372, 383 (M.D. Tenn. 2011). This Court further finds that Ms. Reitman's conclusions on the changes in concentration levels within Plaintiffs' homes and other homes that contained the suspect joists are not unhelpful. How formaldehyde disperses and the rate at which it dissipates, involves scientific understandings beyond that which any layman could be expected to possess. Fed. R. Evid. 702(a) (requiring an expert's scientific, technical, or other specialized knowledge help the trier of fact understand the evidence).

Moreover, Ms. Reitman did not offer any impermissible legal conclusions. As detailed above, an expert is generally not permitted to testify regarding "legal conclusions." *U.S. ex rel. Martin*, 2014 WL 4816006, at *3. In their current form, Ms. Reitman's opinions do not speak directly to the ultimate issue of liability, but rather to the scientific efficacy of Weyerhaeuser's remediation methods. Plaintiffs are free to attack the *actual* sufficiency of the remediations as well as the standard Weyerhaeuser used to determine that effectiveness, through cross-examination, and the presentation of contrary evidence. Furthermore, should Ms. Reitman's opinion be stated as legal conclusion at trial, Plaintiffs may renew its objections. *Sierra v. Williamson*, No. 4:10-

CV-00079-TBR, 2013 WL 228333, at *7 (W.D. Ky. Jan. 22, 2013) ("Whether an expert's testimony embraces an improper legal conclusion often turns on the phrasing of the question posed."). Given the foregoing conclusion, Plaintiffs' Motion to Exclude (ECF No. 114) is **DENIED** and Ms. Reitman's expert witness testimony will not be excluded.

### 3. Weyerhaeuser's Expert – Paul Nony

Paul Nony is a toxicologist and certified industrial hygienist. (ECF No. 12-2 at 5). Weyerhaeuser offers Mr. Nony as an expert on medical causation. (*Id*. at 7). Of the eight opinions Mr. Nony offered, Plaintiffs take issue with four:[8]

1.  The plaintiffs may have been exposed to short-term, low-level formaldehyde concentrations present in their residences before remediation of the joists sufficient to result in symptoms of slight sensory irritation; however, symptoms resulting from such an exposure are transient in nature and would not be associated with any delayed, chronic, or persistent adverse health effects.

2.  The low levels of airborne formaldehyde that were potentially present in the plaintiffs' homes and plaintiffs' short durations of potential exposure prior to remediation would not result in any increased risk of delayed, chronic, or persistent adverse health effects.

3.  Formaldehyde levels present in the plaintiffs' homes post-remediation do not represent a risk to human health as a result of the joists.

4.  The plaintiffs are not at risk of cancer from exposure to formaldehyde from the joists in their homes.

(*Id*. at 8). Plaintiffs make two arguments for the exclusion of Mr. Nony's expert witness testimony. First, Plaintiffs maintain Mr. Nony is not qualified to give expert testimony regarding specific causation, as he has no medical training or knowledge. (ECF No. 115 at 6–7). Second, assuming he is qualified, Plaintiffs argue Mr. Nony's opinions lack any reliable basis. (*Id*. at 7). Plaintiffs maintain Mr. Nony's analysis is "fundamentally flawed" and "woefully biased." (*Id*. at 7–8).

---

[8] Plaintiffs seek to exclude Mr. Nony's opinions on both specific causation and Plaintiffs' risk of developing cancer. (ECF No. 115 at 1). Mr. Nony's other four opinions relate solely to the chemical properties of formaldehyde and the sufficiency of the remediation. (ECF No. 112-2 at 8).

Plaintiffs conclude that Mr. Nony opinions are inconsistent with prevailing medical literature and based on a misunderstanding of medical treatments and differential diagnoses. (*Id*. at 9).

Weyerhaeuser argues that Plaintiffs simply disagree with Mr. Nony's conclusions, and such arguments should go to weight, not admissibility. (ECF No. 126 at 4–6). Regarding reliability, Weyerhaeuser argues that just because Mr. Nony reached different conclusions than Plaintiffs' experts, does not mean he misunderstood the prevailing literature. (*Id*. at 6). Weyerhaeuser further argues that Plaintiffs' arguments on Mr. Nony's qualifications are misplaced. (*Id*. at 7–9). Weyerhaeuser maintains that Mr. Nony does not conclude that there is no specific causation, but rather that there is insufficient information in this case for anyone to determine specific causation. (*Id*. at 7). Moreover, Weyerhaeuser asserts that Mr. Nony's lack of a medical degree does not render him unqualified to conduct a causation analysis, particularly given his background in toxicology. (*Id*. at 7 (citing *Mason v. CVS Health*, 384 F. Supp. 3d 882, 893 (S.D. Ohio 2019)).

Rule 702 requires that an expert witness be "qualified by knowledge, skill, experience, training, or education." And, while generally non-medical doctors are unqualified to render differential diagnoses of medical conditions, that is not always the case. *See e.g. Best*, 563 F.3d 171, 182 (6th Cir. 2009) (recognizing circumstances where a non-medical expert's differential diagnosis is distinguishable from those that are generally excluded). Mr. Nony, however, did not conduct any differential diagnoses of Plaintiffs. *See Blythe v. Schlievert*, 245 F. Supp. 3d 959, 971 (N.D. Ohio 2017) ("A differential diagnosis undertakes to rule out all other causes of injury," it is an "intense and time-consuming exercise[.]"). Mr. Nony did not attempt to diagnose Plaintiff's injuries, nor did he offer any potential alternate causes for those injuries. (ECF No. 112-2). Rather, Mr. Nony simply opined on whether the alleged levels of formaldehyde in Plaintiffs' homes were significant enough to cause Plaintiff's alleged symptoms. He concluded

that where documented, formaldehyde levels were not high enough to cause the alleged symptoms, and otherwise, there was not sufficient evidence conclusively to determine the extent of exposure. This is permissible expert testimony for a toxicologist.

Moreover, as detailed numerous times, challenges to the accuracy of evidence go to the accuracy of the expert's conclusions, not to their reliability, and bear on "the weight of the evidence rather than on its admissibility." *In re Scrap Metal*, 527 F.3d at 529–31. While Plaintiffs' may feel Mr. Nony's analysis is flawed, because his testimony rests on "rational explanations and facts on the record[,]" Plaintiffs' objections are more appropriately addressed on cross-examination. *Little Hocking Water Ass'n, Inc.*, 90 F. Supp. 3d at 758.

Pursuant to the foregoing analysis, this Court finds the Mr. Nony's opinions are sufficiently reliable and not outside the scope of his expertise. As such, Plaintiffs' Motion to Exclude (ECF No. 115) is **DENIED** and Mr. Nony's expert witness testimony will not be excluded.

### 4. Weyerhaeuser's Expert – Renee Kalmes

Renee Kalmes is a certified industrial hygienist. (ECF No. 112-11 at 8). Weyerhaeuser offers Ms. Kalmes as an expert on the effects of formaldehyde exposure and the levels of formaldehyde in Plaintiffs' homes. (*Id*. at 19–20). Ms. Kalmes offered three opinions:

1. The duration and frequency of any potential formaldehyde exposure, along with the home conditions and alleged health responses, varied significantly among plaintiffs in homes where this product was installed.

2. Plaintiffs provide no documented or verifiable data to assess representative breathing zone formaldehyde concentrations during the time period in which they occupied their homes prior to remediation of the TJI Flak Jacket coating.

3. Plaintiffs' conditions were not sufficient for individuals in homes to have received a meaningful exposure associated with any chronic formaldehyde-related health effects.

(*Id*.). Plaintiffs seek to exclude Ms. Kalmes' opinions, arguing they are based on an inapplicable standard and are unreliable. (ECF No. 116). The inapplicable standard to which Plaintiffs refer is the WHO's indoor air quality guidelines for formaldehyde. (*Id*. at 1). Plaintiffs maintain that this reliance makes Ms. Kalmes' opinions unreliable because the guideline assumes a 30-minute average exposure, while Plaintiffs were exposed for significantly longer. (*Id*.). Furthermore, Plaintiffs argue that Ms. Kalmes' opinion that Plaintiffs' exposures to formaldehyde varied greatly, is "pure speculation" and not derived from any data or scientific evidence. (*Id*. at 2). Finally, Plaintiffs argue that Ms. Kalmes' opinion on formaldehyde-related health risks is not reliable, as "current science does not provide a foundation for her conclusions." (*Id*.).

Weyerhaeuser argues that Ms. Kalmes' testimony should not be excluded, as it aids the finder of fact with assessing the health impacts of Plaintiffs' exposure to formaldehyde. (ECF No. 127 at 1). Weyerhaeuser asserts Ms. Kalmes' reliance on the WHO's indoor air quality guidelines, as opposed to Plaintiffs' preferred ATSDR guidelines, is not grounds for exclusion. (*Id*. at 3). This is the case, says Weyerhaeuser, because "there is no generally accepted U.S. standard for formaldehyde concentrations in residential settings." (*Id*. at 4). Weyerhaeuser further argues Ms. Kalmes' opinions on formaldehyde exposure are based on Plaintiffs' testimony, not speculation. (*Id*. at 5). Weyerhaeuser asserts that this reliance renders Ms. Kalmes' conclusions reasonable. (*Id*. at 6). Finally, Weyerhaeuser states that Ms. Kalmes' opinion regarding formaldehyde-related health risks is based on reliable scientific studies, including the ATSDR guidelines and a toxicokinetic study published in a peer-reviewed science journal. (*Id*. at 7–8).

While Rule 702 requires expert testimony be based on sufficient facts or data, "an expert need not base his opinion on the 'best possible evidence,' or the 'most ideal scientific evidence' in order for it to gain admissibility." *Little Hocking Water Ass'n, Inc.*, 90 F. Supp. 3d at 757(quoting

28

*U.S. ex rel. Martin*, 2014 WL 4816006, at *2–3). The Court's role, rather, is to ensure that expert testimony is founded upon "good grounds, based on what is known." *U.S. ex rel. Martin*, 2014 WL 4816006, at *2–3; *see also In re Countrywide Fin. Corp. Mortgage–Backed Sec. Litig.*, 984 F.Supp.2d 1021, 1036 (C.D. Cal.2013) ("The *Daubert* standard does not exist to ensure that only the most ideal scientific evidence is admissible in court proceedings, but instead to ensure that expert testimony is derived by the scientific method."). Ms. Kalmes' reliance on the WHO's indoor air quality guidelines also does not constitute grounds for exclusion. This Court finds that the evidence upon which Ms. Kalmes did base her opinions—the ATSDR guidelines and a peer-reviewed journal study—is sufficiently reliable. Challenges to the accuracy or import of such evidence, go to the accuracy of Ms. Kalmes' conclusions, not to their reliability, and bear on "the weight of the evidence rather than on its admissibility." *In re Scrap Metal*, 527 F.3d at 529–31.

Plaintiffs' claim that Ms. Kalmes' opinions are too speculative, misinterpret Rule 702's certainty requirement. As detailed above, Rule 702 does not require "anything approaching absolute certainty." *Tamraz*, 620 F.3d at 671–72. Ms. Kalmes' opinions on formaldehyde exposure are founded on "good grounds, based on what [was] known." *U.S. ex rel. Martin*, 2014 WL 4816006, at *2–3. As both parties have highlighted, there is not abundant evidence in the record on the pre-remediation formaldehyde levels in Plaintiffs' homes. Given this, it was reasonable for Ms. Kalmes to base her opinions partly on Plaintiffs' testimony, as it is "what was known." *Id*.

Accordingly, this Court finds Ms. Kalmes' opinions neither speculative nor unreliable. Plaintiffs' Motion to Exclude (ECF No. 116) is **DENIED** and Ms. Kalmes's expert witness testimony will not be excluded.

## IV. MOTIONS FOR SUMMARY JUDGMENT

This Court first addresses three preliminary issues. First, regarding Defendant BluSky's Motion for Summary Judgment; second, regarding Plaintiffs' claim for putative damages; and third, regarding the statutory abrogation of Plaintiffs' claims.

First, regarding BluSky, the First Amended Complaint alleges several claims relating to alleged damage to Plaintiffs' homes caused by BluSky's workers during the remediation. (ECF No. 26 at ¶¶ 19, 164–170). Plaintiffs also assert claims against Weyerhaeuser and Westport for "negligent failure to supervise subcontractors." (*Id*., ¶¶ 155–160). At oral argument, the parties informed the Court that Plaintiffs and BluSky have reached a settlement in principle. This includes the claims for supervisory liability asserted against the remaining Defendants. Accordingly, all of Plaintiffs' claims regarding property damage done during the remediation, including any claims of supervisory liability, are **DISMISSED**. And Defendant BluSky's Motion for Summary Judgment (ECF No. 111) is **DISMISSED**.

Second, regarding punitive damages, the First Amended Complaint asserts a claim for Reckless and Wanton Infliction of Bodily Injuries and Property Damage, and Reckless and Malicious Disregard for the Rights and Safety of Others (Count 14). (ECF No. 26 at ¶¶ 161–163). Upon review, this claim is truly one for punitive damages. (*Id*., ¶ 162). As there is no such freestanding cause of action under Ohio or federal law, dismissal is appropriate. *Beair v. Ohio Dep't of Rehab.*, 156 F. Supp. 3d 898, 907 (N.D. Ohio 2016). The dismissal, however, is "without prejudice to [Plaintiffs'] ability to obtain such damages should [they] prevail on one or more of [their] claims, and, in doing so, provide an evidentiary basis for a punitive-damages charge and verdict." *Id*. Accordingly, Count Fourteen in the First Amended Complaint is hereby **DISMISSED without prejudice**.

Third, regarding the abrogation of Plaintiffs' claims, Defendants Westport and Weyerhaeuser both argue that several of Plaintiffs' claims are abrogated by the Ohio Product Liability Act ("OPLA"). (ECF No. 91 at 16–18; ECF No. 110 at 12). Plaintiffs do not substantively respond to this argument. (ECF No. 133 at 44).

Ohio product liability law was consolidated under the OPLA and applies to "[a]ny recovery of compensatory [or punitive] damages based on a product liability claim" O.R.C. §§ 2307.72(A),(B). The OPLA defines a product liability claim as one:

> "that is asserted in a civil action ... and that seeks to recover compensatory damages from a manufacturer or supplier for death, physical injury to person, emotional distress, or physical damage to property other than the product in question that allegedly arose from any of the following:
>
> (a) The design, formulation, production, construction, creation, assembly, rebuilding, testing, or marketing of that product;
>
> (b) Any warning or instruction, or lack of warning or instruction, associated with that product;
>
> (c) Any failure of that product to conform to any relevant representation or warranty.

O.R.C. § 2307.71(M).

Effective April 7, 2005, the OPLA eliminated common law product liability causes of action. Ohio Rev. Code § 2307.71(B) ("Sections 2307.71 to 2307.80 of the Revised Code are intended to abrogate all common law product liability claims or causes of action."); *see also Miles v. Raymond Corp.*, 612 F. Supp. 2d 913, (N.D. Ohio 2009) ("the language of 2307.71(B) clearly proclaims the legislature's specific intention to eliminate common law product liability causes of action"); *Routzahn v. Garrison*, No. 21190 2006 WL 1984498 at * 10 (Ohio App. 2 Dist., July 14, 2006) (stating that "the General Assembly eliminated common law product liability causes of action effective April 7, 2005 . . . "). The OPLA also abrogates claims for strict products liability,

negligent failure to warn, breach of express warranty, and breach of implied warranty. *See McConnell v. Cosco, Inc.*, 238 F.Supp.2d 970, 974–75 (S.D. Ohio 2003) ("Strict products liability claims in Ohio are governed by Ohio Revised Code sections 2307.71 through 2307.80."); *Delahunt v. Cytodyne Technologies*, 241 F.Supp.2d 827, 842–44 (dismissing claims for negligence and breach of express warranty because such claims are preempted by the OPLA); *Stratford v. SmithKline Beecham Corp.*, No. 2:07–CV–639 2008 WL 2491965 (S.D. Ohio June 17, 2008) (internal citations omitted) ("The OPLA has preempted the implied warranty of merchantability and the implied warranty of fitness for a particular purpose."); *White v. DePuy, Inc.*, 129 Ohio App.3d 472, 718 N.E.2d 450, 459 (Ohio Ct. App. 1998) (holding that plaintiff's breach of express warranty claim was a common law products liability claim abrogated by the OPLA).

Under the OPLA, a claimant is precluded from recovering for economic damages alone and can only seek recovery that is allowed by the terms of the statute. See Ohio Rev. Code § 2307.71(G) (defining "harm" as "death, physical injury to person, serious emotional distress, or physical damage to property other than the product in question," and clarifying that "[e]conomic loss is not 'harm.'"); Ohio Rev. Code § 2307.71(M) (defining a "product liability claim" as one seeking to "recover compensatory damages ... for death, physical injury to person, emotional distress, or physical damage to property other than the product in question . . . "); Ohio Rev. Code § 2307.71(B) (defining "[e]conomic loss" as "direct, incidental or consequential pecuniary loss, including, but not limited to, damage to the product in question, and nonphysical damage to property other than that product," and clarifying that "[h]arm is not 'economic loss'") Where however, "recovery of compensatory damages for economic loss based on a claim that is asserted in a civil action, other than a product liability claim, is not subject to [the OPLA], but may occur under the common law of this state or other applicable sections of the Revised Code." Ohio Rev.

Code 2307.72(C); *see also Hoffer v. Cooper Wiring Devices, Inc.*, No. 1:06–CV–763, 2007 WL 1725317 *2 (N.D. Ohio June 13, 2007) ("[T]o the extent Plaintiff seeks damages for economic loss, his claims do not fall under the purview of the OPLA.").

Courts in this jurisdiction have found that common law negligence actions are also preempted by the OPLA where "[t]he actionable conduct that forms the basis of the negligence claim . . . is the same conduct that the OPLA defines as giving rise to a 'products liability claim.'" *Stratford*, 2008 WL 2491965, at *5 ("Plaintiffs are dressing up an OPLA claim as a negligence claim, which really amounts to a 'common law products liability claim.'").

Plaintiffs First Amended Complaint is widely pled. And, as Defendants did not move to dismiss, the First Amended Complaint was never scrutinized under the umbrella of Rule 12(b). As such, there are numerous live claims that fail as a matter of law. First, Plaintiffs' claims for Breach of Express Warranty, Breach of Implied Warranty, Common Law Strict Liability Design or Manufacturing Defect, and Common Law Failure to Warn, are all common law product liability causes of action abrogated by the OPLA. *See McFarland v. Ethicon, Inc.*, No. 2:20-CV-02188, 2020 WL 4464401, at *2 (S.D. Ohio Aug. 4, 2020). Second, because the actionable conduct in Plaintiffs' claims for Negligence, and Negligent Infliction of Bodily Injury, is the same conduct the OPLA defines as giving rise to a products liability claim, those claims too are abrogated. *Id*. (dismissing plaintiff's claims for "negligence," "gross negligence" and "negligent infliction of emotional distress," as abrogated by the OPLA.).

Accordingly, the following claims in Plaintiffs' First Amended Complaint are **DISMISSED**: Count 4 (Breach of Express Warranty); Count 5 (Breach of Implied Warranty); Count 7 (Common Law Strict Liability Design or Manufacturing Defect); Count 8 (Common Law Failure to Warn); Count 10 (Negligence); and Count 12 (Negligent Infliction of Bodily Injury).

### A. Westport's Motion for Summary Judgment

#### 1. Plaintiffs OPLA Claims

Westport argues that it is entitled to summary judgment on Plaintiffs' OPLA claims for strict liability design or manufacturing defect and for failure to warn, because it is not a "supplier" under the statute. (ECF No. 91 at 16–18). Westport maintains that, rather than a "supplier," it is either a seller of real property or a "'provider of professional services who, incidental to a professional transaction the essence of which is the furnishing of judgment, skill, or services, sells or uses a product.'" (*Id*. at 17 (quoting O.R.C. § 2307.71(A)(15)(b)(ii) and (iii))). To the first point, Westport argues that as a "builder-vendor," it constructs homes and sells real-estate, which makes it a seller of real property under the statute. (*Id*.). Westport maintains that this is not a "mixed transaction" as contemplated by the Ohio's Consumer Sales Practices Act ("CSPA"), because that statute explicitly does not apply to home construction service contracts.[9] (ECF No. 142 at 4). Alternatively, Westport argues it is a provider of professional services—the construction of Plaintiffs' homes—in which the use of the joists is merely incidental to the provision of that service. (ECF No. 91 at 17). Westport notes that its business is selling completely constructed homes, not individual joists. (*Id*.).

Plaintiffs argue Westport has not carried its burden of demonstrating it is not a "supplier" under the OPLA. (ECF No. 133 at 44). They maintain that under Ohio law home construction is not solely a claim for the sale of real property, but instead is a "mixed transaction[] that also involve[s] the transfer of consumer goods." (*Id*. at 44). The joists, say Plaintiffs, were part and parcel of the sale of their homes because without them, the homes could not be built. (*Id*. at 45).

---

[9] The Purchase Agreements also explicitly recognized the inapplicability of the CSPA. (ECF No. 91-2 at ¶ 30 ("OHIO CONSUMER SALES ACT NOT APPLICABLE")).

Accordingly, Plaintiffs maintain that because there is at least a genuine dispute of material fact as to whether Westport is a "supplier" under the OPLA, summary judgment is inappropriate. (*Id*.).

While the OPLA generally imposes liability on manufacturers, Revised Code § 2307.78(b) "subjects a supplier to product liability 'as if it were the manufacturer,' under certain circumstances[.]" *Stiner v. Amazon.com, Inc.*, 2020-Ohio-4632, 162 Ohio St. 3d 128, 131 (quoting O.R.C. § 2307.78(B)(1) and (2))). Under the OPLA a "supplier" includes "[a] person that, in the course of a business conducted for the purpose, sells, distributes, leases, prepares, blends, packages, labels, or otherwise participates in the placing of a product in the stream of commerce." O. R.C. 2307.71(A)(15)(a)(i). A "supplier" does not include a "seller of real property [or] . . . [a] provider of professional services who, incidental to a professional transaction the essence of which is the furnishing of judgment, skill, or services, sells or uses a product." *Id*. at § 2307.71(A)(15)(b)(ii)–(iii). A "provider of professional services" must prove by a preponderance, that they were employed because of their professional expertise, "the essence of which is the furnishing of judgment, skill, or services." *Jones v. A Best Prod. Co.*, 2003-Ohio-6612.

This Court finds that Westport is, at least in part, a "seller of real property." The Purchase Agreements illustrate that Plaintiffs contracted for *both* the construction of a home as well as the plot of land upon which it sat. (*See* ECF No. 91-2 at ¶¶ 1–3) (emphases added). The question then becomes whether constructing and selling a home *as well as* the land it sits on allows Westport to fall within the either of these exceptions to supplier liability. This Court finds that it does.

The plain meaning of the statute is clear—sellers of *real property* are <u>not</u> suppliers under the OPLA. O.R.C. § 2703.71(A)(15)(b)(ii) (emphasis added). "The plain meaning of legislation should be conclusive, except in the rare cases [in which] the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters." *United States v. Ron Pair*

*Enterprises, Inc.*, 489 U.S. 235, 242 (1989). "To determine the common, everyday meaning of a word, [the Ohio Supreme Court has] consistently used dictionary definitions." *Campus Bus Serv. v. Zaino*, 786 N.E.2d 889, 891 (Ohio 2003). Black's Law Dictionary defines "real property" as "[l]and and *anything growing on, attached to, or erected on it*, excluding anything that may be severed without injury to the land." Black's Law Dictionary (11th ed. 2019) (emphasis added). Even more persuasive, the Ohio revised code, albeit in a different title, defines "real property" to include "all buildings, structures, improvements, and fixtures of whatever kind on the land . . ." O.R.C. § 5701.02(A). There is little room for ambiguity in these definitions—real property includes any building or immovable fixture on the land. Accordingly, constructing and selling a home *as well as* the real property it sits on, makes Westport a "seller of real property" and not a supplier under the OPLA. Westport is **GRANTED** summary judgment on Plaintiffs' claims for strict liability design or manufacturing defect (Claim 6) and statutory failure to warn (Claim 9).

### 2. *Plaintiffs' Magnuson-Moss Warranty Act Claim*

Westport argues it cannot be liable under the Magnuson-Moss Warranty Act (the "MMWA") because the joists are not "consumer products." (ECF No. 91 at 18). Westport cites regulations from the Federal Trade Commission ("FTC"), which state that "'where a consumer contracts with a builder to construct a home, the building materials to be used are not consumer products.'" (*Id*. at 19 (quoting 16 C.F.R. § 700.1(f))). The joists, says Westport, were not purchased over the counter; they were sold to Plaintiffs as part of a fully constructed home. (*Id*. at 20). As such, Westport maintains that its purchase of the joists was incidental to the Purchase Agreements, which makes them not "consumer products" as defined by the MMWA. (*Id*.).

Count Eleven in Plaintiffs' First Amended Complaint alleges that the joists are a consumer product as defined by the MMW, 15 U.S.C. § 2301(1). (ECF No. 26 at ¶ 141). In their response to

Westport's Motion for Summary Judgment, Plaintiffs do not substantively respond to Westport's arguments on this claim. In fact, Plaintiffs do not even mention the MMWA in their response. Westport acknowledges this lack of response, asserting it constitutes waiver. (ECF No. 142 at 3).

Generally, "a plaintiff is deemed to have abandoned a claim when [it] fails to address it in response to a motion for summary judgment." *Brown v. VHS of Michigan, Inc.*, 545 F. App'x 368, 372 (6th Cir. 2013); *see also Clark v. City of Dublin*, 178 Fed. Appx. 522, 524–25 (6th Cir. 2006) (recognizing that the failure to respond properly to motion for summary judgment constitutes abandonment of a claim). As Plaintiffs have failed to defend their claim under the MMW, this Court may deem that claim waived and grant Westport summary judgment. For the sake of thoroughness, however, the Court briefly addresses the merits of Westport's argument.

"The Magnuson-Moss Warranty Act [] is a vehicle to assert state law breach of warranty claims in federal court." *Albright v. Sherwin-Williams Co.*, No. 1:17 CV 2513, 2019 WL 5307068, at *10 (N.D. Ohio Jan. 29, 2019). The Act provides that "a consumer who is damaged by the failure of a supplier, warrantor, or service contractor to comply with any obligation under this chapter, or under a written warranty, implied warranty, or service contract, may bring suit for damages and other legal and equitable relief." 15 U.S.C. § 2310(d)(1). To establish a claim under the MMWA, "a plaintiff must show that the item at issue was a consumer product." *Gentek Bldg. Prod., Inc. v. Sherwin-Williams Co.*, 491 F.3d 320, 331 (6th Cir. 2007). Moreover, the applicable FTC regulations explain:

> [i]n the case where a consumer contracts with a builder to construct a home, . . . the building materials . . . used are not consumer products. Although the materials are separately identifiable . . . it is the intention of the parties to contract for the construction of realty which will integrate the component materials.

16 C.F.R. § 700.1(f). Courts in this Circuit have repeatedly recognized that the FTC's construction of the MMWA is entitled to deference. *See Higgs v. Warranty Group*, 2007 WL 2034376, *8 (S.D.

Ohio July 11, 2007). Considering the aforementioned regulations, Courts have generally held that "'the beams, wallboard, wiring, plumbing, windows, roofing, and other structural components of a dwelling are not consumer products when they are sold as part of real estate covered by a written warranty.'" *Utter v. Peachtree Companies, Inc.*, No. 1:08CV767, 2010 WL 11635925, at *6 (S.D. Ohio Aug. 3, 2010) (quoting 16 C.F.R. § 700.1(e)).

The First Amended Complaint acknowledges that the joists are covered by a "written warranty" under 15 U.S.C. § 2301(6)(A)–(B). (*See* ECF No. 26 at ¶ 143). Considering that the joists are "structural components" sold as part of real estate covered by said written warranty, they are not consumer products as defined by the MMWA. Plaintiffs' claim that Westport violated the MMWA when it utilized the joists in the construction of their homes cannot abide. Given this, and the fact that Plaintiffs failed to defend this claim in their response to Westport's Motion for Summary Judgment, Westport is **GRANTED** summary judgment on this claim. As Plaintiffs also assert this legally deficient claim against Weyerhaeuser, it is also **GRANTED** summary judgment.

### 3.  *Plaintiffs' Unjust Enrichment Claim*

Westport next argues it is entitled to summary judgment on Plaintiffs' unjust enrichment claim, because an express contract governs their relationship. (ECF No. 91 at 20–22). Westport maintains that under Ohio law, when a case reaches summary judgment, unjust enrichment claims should be dismissed if there is no dispute the parties had an express contract. (*Id*. at 20). This claim, says Westport, arises solely from the contract between the parties—the Purchase Agreements. (*Id*. at 21). Westport argues that because the Purchase Agreements exclusively govern the construction and sale of the homes, any unjust enrichment claim cannot proceed. (*Id*. at 22). Finally, Westport asserts Plaintiffs have not alleged fraud, illegality, or bad faith. (*Id*.).

The First Amended Complaint alleges Westport "received substantial benefits from Plaintiffs purchasing the joists . . . [and] [i]t is inequitable for [Westport] to retain the benefit of the payments under the circumstances." (ECF No. 26 at ¶¶ 54, 57). Plaintiffs, however, did not substantively respond to Westport's arguments on this claim in their opposition brief. Westport acknowledges this failure and maintains Plaintiffs have forfeited this claim. (ECF No. 142 at 3).

The aforesaid failure, as with Plaintiffs' MMWA claim, constitutes waiver and entitles Westport to summary judgment. *See Colston v. Cleveland Pub. Library*, No. 1:12–CV–204, 2012 WL 3309663, at *2 n. 2 (N.D. Ohio Aug. 13, 2012) (deeming a claim abandoned and granting summary judgment where a plaintiff "did not respond or even mention [the] claim in her opposition to Defendants' motions for summary judgment"). As before, this Court will still evaluate the substance of Westport's arguments on this claim, for the sake of thoroughness.

Under Ohio law, absent fraud, illegality, or bad faith, a party to an express contract may not bring a claim for equitable relief, particularly when the agreement contains a provision governing the allegedly inequitable conduct at issue. *See Hughes v. Oberholtzer*, 162 Ohio St. 330, 123 N.E.2d 393, 396 (Ohio 1954) (holding it "is generally agreed that there cannot be an express agreement and an implied contract for the same thing existing at the same time"); *Delicom Sweet Goods of Oh., Inc. v. Mt. Perry Foods, Inc.*, No. 04 CA 4, 2005 WL 525185, at *4 (Ohio Ct. App. Mar. 2, 2005) (noting that a party cannot prevail on a theory of unjust enrichment when they have formed an express contract); *Wolfer Ent., Inc. v. Overbrook Dev. Corp.*, 132 Ohio App.3d 353, 724 N.E.2d 1251, 1254 (Ohio Ct. App. 1999) (holding that a "party seeking a remedy under a contract cannot also seek equitable relief under a theory of unjust enrichment or quantum meruit, because the terms of the agreement define the parties' relationship").

Plaintiffs and Westport had an express contract—the Purchase Agreements. As such, Plaintiffs' unjust enrichment claim cannot stand. It would be inequitable for the Court to substitute general notions of reasonableness for the unmistakable language to which the parties agreed. Accordingly, Westport is **GRANTED** summary judgment on Plaintiffs' unjust enrichment claim.

### 4. *Plaintiffs' Second Breach of Express Warranty Claim*

The First Amended Complaint alleges two breach of express warranty claims: (1) that the joists failed to conform to a relative representation or warranty; and (2) that Westport breached its warranty to construct the homes in a workmanlike manner. (ECF No. 26 at ¶¶ 69, 75). While the first is abrogated by the OPLA, the second is not. Westport argues it is entitled to summary judgment judgment on Plaintiffs' second breach of express warranty claim because it is duplicative of Plaintiffs' breach of contract claim. (ECF No. 91 at 26).

Westport argues Plaintiffs' second breach of express warranty claim is not properly pled. (ECF No. 91 at 26). Westport maintains that "a claim that a builder breached an express warranty to build a residence in a workmanlike manner is manifestly a breach of contract claim." (*Id*.). Because the Purchase Agreements establish Westport's duty to build Plaintiffs' homes in a workmanlike manner, and Plaintiffs alleged Westport has breached this duty in a separate claim, Westport asserts that this breach of express warranty claim must fail. (*Id*.). Plaintiffs, meanwhile, do not mention this claim in their response to Westport's Motion for Summary Judgment. Westport acknowledges this in its reply memorandum, asserting it constitutes waiver. (ECF No. 142 at 3).

This Court has already recognized that, under Ohio law "[w]hen a party contracts for future construction services, . . . the contract includes an implied duty to perform in a workmanlike manner. Consequently, if the builder or contractor breaches that implied duty, it is liable in contract, not tort." *Jarupan*, 173 Ohio App. 3d at 294 n.1; *see also Phelps v. Lengyel*, 237 F. Supp.

2d 829, 842 (N.D. Ohio 2002) (holding that plaintiffs' breach of warranty claim alleging defendant builder-vendor breached the express warranty to build the residence in a "workmanlike manner" could not coexist with their breach of contract claim). Plaintiffs' breach of contract claim against Westport still stands. Plaintiffs cannot recover for Westport's alleged failure to build their homes in a workmanlike manner under both contract and tort. Accordingly, and because Plaintiffs have effectively waived this claim by not responding to it, Westport is **GRANTED** summary judgment on Plaintiffs second breach of express warranty claim.

### 5. *Plaintiffs' Breach of Contract and Violation of HCSSA Claims*

Finally, Westport argues that it is entitled to judgment as a matter of law on Plaintiffs' breach of contract and HCSSA claims, because it did not fail to construct Plaintiffs' homes in a workmanlike manner. (ECF No 91 at 27–31). Westport maintains that where, as here, there is a manufacturing defect of the construction material that would not have been obvious to the contractor, the contractor cannot be found to have failed to construct the home in a workmanlike manner. (*Id*. at 28). According to Westport, the evidence does not support a finding that the defect in the joists was so obvious at the time of construction. (*Id*.). Westport represents that it ordered and purchased complete home building packages—not individual pieces of lumber. (ECF No. 142 at 7). While it requested these materials meet local and fire building codes, Westport relied on Strait and Lamp to select the specific materials. (*Id*.). As such, Westport argues that it could not have reasonably known about the off-gassing issue until July 6, 2017; the first date Weyerhaeuser notified builders. (*Id*. at 29). At that point, Plaintiffs' homes had been constructed and final building inspections were complete. (*Id*. at 29–30). Westport argues Plaintiffs' claim that it knew earlier than this, is speculation that does not create a genuine issue of material fact. (*Id*. at 30).

Plaintiffs argue Westport has not shown it constructed their homes in a workmanlike manner. (ECF No. 133 at 46). Rather, say Plaintiffs, the evidence demonstrates Westport installed defective materials after failing to inquire whether the joists purchased from Weyerhaeuser were merchantable and safe for their intended use. (*Id*.). Plaintiffs recognize they have the burden of showing a lack of good workmanship and proximate cause but note that Courts have generally held each to be a question of fact. (*Id*.). Plaintiffs maintain the evidence shows the joists were defective, constituting a lack of good workmanship, and their damages were directly caused by the formaldehyde that leaked from the defective joists. (*Id*. at 47). Plaintiffs go on to argue that, based on the joists' Safety Data Sheet ("SDS"), "Westport should have at least known of the potential hazard created by . . . urea formaldehyde." (*Id*. at 48). The Purchase Agreement required Westport to ensure that any deviation from its standard materials conformed to the same quality as the previous materials. (*Id*.).

The HCSSA provides, in relevant part, "[n]o home construction service supplier shall[,] . . . [a]fter entering into a contract with an owner, . . . [f]ail to perform the home construction service in a workmanlike manner[]." O.R.C. § 4722.03. Similarly, the in the Purchase Agreements, Westport explicitly represents that "[c]onstruction work shall be done in a workmanlike manner . . . ." (ECF No. 91-2 at ¶ 2). The Ohio Supreme Court defined this duty in *Mitchem v. Johnson*.

> A duty is imposed by law upon a builder-vendor of a real-property structure to construct the same in a workmanlike manner and to employ such care and skill in the choice of materials and work as will be commensurate with the gravity of the risk involved in protecting the structure against faults and hazards, including those inherent in its site. If the violation of that duty proximately causes a defect hidden from revelation by an inspection reasonably available to the vendee, the vendor is answerable to the vendee for the resulting damages.

218 N.E.2d 594, 595 (1966). This duty requires a builder-vendor act reasonably and "exercise that degree of care which a member of the construction trade in good standing in that community would

exercise under the same or similar circumstances." *Jarupan v. Hanna*, 878 N.E.2d 66, ¶ 19 (2007). Tasked with determining whether a builder-vendor complied with this duty, Courts must assess whether proper materials, workmanlike skill and judgment were used. *Gilham v. Stasiulewicz*, 2010-Ohio-6407, 2010 WL 5545391, ¶ 48. Regarding the appropriateness of the materials used, the builder-vendor is only liable for failing to disclose what it should have known, i.e., "a fault hidden from revelation by an inspection reasonably available to the vendee and caused by poor workmanship or materials or both." *Mitchem*, 218 N.E.2d at 595.

Upon review of the parties' arguments and evidence, this Court finds that there exists a genuine issue of material fact as to whether Westport constructed Plaintiffs' homes in a workmanlike manner, where it allegedly incorporated defective materials into the construction of the homes. The parties dispute whether Westport learned of the defect before the before Plaintiffs' homes were completed, whether the SDS could have alerted Westport to the defect in the joists prior to installation, and whether the SDS did in fact alert Westport to the defect in the joists. Given these factual disputes, this Court cannot grant Westport summary judgment. As such, Westport's motion for summary judgment on Plaintiffs' breach of contract claim (Claim 1) and breach of the HSCCA (Claim 3) is **DENIED**.

### B. Weyerhaeuser's Motion for Summary Judgment

Weyerhaeuser asserts that Plaintiffs' claims do not present a genuine issue of material fact and fail as a matter of law. In making this argument, Weyerhaeuser divides Plaintiffs' claims in two: (1) Plaintiffs' design defect and failure to warn claims; and (2) Plaintiffs' claims relating to damage done during the remediation. (*Id*. at 2). As the latter of these two claims are now moot, given the settlement between Plaintiffs and BluSky, this Court only evaluates Weyerhaeuser's arguments on Plaintiffs' design defect and failure to warn claims.

### 1. *Plaintiffs' Design Defect and Failure to Warn Claims*

Weyerhaeuser argues that Plaintiffs' statutory design defect and failure to warn claims fail because Plaintiffs have not presented admissible expert testimony on the issue of proximate cause. (ECF No. 110 at 5–11). Weyerhaeuser maintains that "[t]here is no evidence in this case from which the actual exposure of any plaintiff to such off-gassing can be quantified in terms of actual levels of exposure, actual extent of exposure, actual duration of exposure, or individual susceptibility of any plaintiff to exposure." (*Id*. at 5). Given this lack of evidence, Weyerhaeuser asserts that Plaintiffs have not sufficiently shown that any of their alleged personal injuries resulted from their exposure to formaldehyde. (*Id*. at 5–6). Weyerhaeuser highlights that Plaintiffs have submitted no medical records from a treating physician confirming the cause of their alleged injuries. (*Id*.). Plaintiffs' experts, Weyerhaeuser says, all provide inadmissible evidence which cannot establish a causal link between Plaintiffs' alleged injuries and the defective joists. (*Id*. at 9). Weyerhaeuser further argues Plaintiffs failed to prove their alleged emotional distress injuries and have not shown these injuries are "severe or debilitating." (*Id*. at 11). Assuming Plaintiff has presented sufficient evidence to establish a genuine issue of material fact on medical causation, Weyerhaeuser argues these claims still fail. (*Id*. at 12–13). Weyerhaeuser asserts that Plaintiffs' statutory strict liability claim fails because the joists were manufactured as designed, and there is no evidence that their design, formulation, manufacture, or construction led to the claimed injuries. (*Id*. at 12). Finally, Weyerhaeuser argues that Plaintiffs' failure to warn claim fails because Weyerhaeuser issued a sufficient warning in the SDS, which was adequate on its face. (*Id*.). The SDS, Weyerhaeuser argues, is in compliance with the Hazard Communications Standard. (*Id*.).

Plaintiffs assert they suffered multiple illnesses and symptoms consistent with exposure to formaldehyde before vacating their respective premises, and those symptoms substantially resolved upon their respective evacuations. (ECF No. 133 at 39). These illnesses included:

- migraine headaches, upper respiratory symptoms, nausea, runny & bleeding noses, burning or watery eyes, burning and scratchy throats, cough, wheezing, chest tightness and congestion;
- stomach pains and gastrointestinal distress;
- Stress and anxiety about potential long-term effects from such significant exposure to formaldehyde, such as cancer and damage to internal organs;
- Plaintiff Stephen Davies developed a growth in his throat that required removal. Additionally, Plaintiff Catherine Davies has had a series of health problems during and after her exposure and was diagnosed with leukemia in 2021.

(*Id*. at 40). Plaintiffs maintain that, under Ohio law, "these damages are not classified as medical injuries necessitating expert causation testimony." (*Id*. (citing *Keller v. Chism*, 2019-Ohio-1714, 136 N.E.3d 27, ¶ 30 (11th Dist.))). Plaintiffs assert that Weyerhaeuser has not demonstrated they are precluded from seeking past pain-and-suffering damages for their symptoms and illnesses before the remediation. (*Id*. at 41). Those damages can only be ascertained a jury. (*Id*.).

Concerning Weyerhaeuser's alternative arguments, Plaintiffs maintain summary judgment is similarly inappropriate. First, regarding their statutory strict liability claim, Plaintiffs maintain they have sufficiently shown the joists were defective, that defect existed when they left Weyerhaeuser's hands, and the defect proximately caused their injuries. (ECF No. 133 at 41). That, say Plaintiffs, is all that is required under Ohio law. (*Id*.). Next, regarding their statutory failure to warn claim, Plaintiffs assert that the SDS was not presented to any of the homeowners. (*Id*. at 42). As such, they contend that the warning was in an "unreasonable place such that a reasonable jury could conclude that the warnings should have been somehow more noticeable." (*Id*.).

To prevail on a failure to warn claim under Ohio law, a plaintiff must prove three elements: (1) a duty to warn against reasonably foreseeable risks; (2) breach of this duty; and (3) an injury

that is proximately caused by the breach. *Graham v. Am. Cyanamid Co.*, 350 F.3d 496, 514 (6th Cir. 2003). Similarly, to prevail on a design defect[10] claim under the OPLA, Plaintiffs must prove: "(1) the existence of a defect in the product at issue, (2) that the defect existed at the time the product left the hands of the manufacturer, and (3) the defect was the direct and proximate cause of the plaintiff's injury." *Jones v. Staubli Motor Sports Div. of Staubli Am. Corp.*, 897 F. Supp. 2d 599, 612 (S.D. Ohio 2012).

The parties' arguments on Plaintiffs' design defect claim are generally insufficient, and ultimately create a genuine issue of material fact. Weyerhaeuser simply asserts, without any support, that "[t]he joists in question were manufactured as designed, and there is no evidence that their design, formulation, manufacture and construction led to the claimed injuries." (ECF No. 110 at 12). Similarly, Plaintiffs perfunctorily state that "Weyerhaeuser concedes that there was a defect in the product it manufactured existing at the time the product left Weyerhaeuser's hands[;]" a point Weyerhaeuser denies in its reply brief. (ECF No. 143 at 8). Ultimately, the parties true dispute on this claim, as with its failure to warn claim, is whether Plaintiffs have sufficiently shown the defect and/or failure to warn was the proximate cause of their injuries.

Under Ohio law, proximate cause is a factual issue. *Utzinger v. United States*, 432 F.2d 485, 489 (6th Cir. 1970). Weyerhaeuser argues Plaintiffs have not presented any admissible expert testimony that shows the alleged defective joists were the proximate cause of Plaintiffs' injuries. (ECF No. 110 at 6–11). By denying Weyerhaeuser's motions to exclude, however, this Court has already undermined this argument.

---

[10] The First Amended Complaint alleges Weyerhaeuser is liable under the OPLA for Statutory Strict Liability Design or Manufacturing Defect (Claim 6) and Statutory Failure to Warn (Claim 9). While Plaintiffs do develop arguments on their defective design and failure to warn claims, they do not develop the manufacturing defect theory anywhere in the record. As such, the Court will address only Plaintiffs' design defect and failure to warn theories and assume Plaintiffs have discarded other theories to establish product liability. *See Great N. Ins. Co. v. BMW of N. Am. LLC*, 84 F. Supp. 3d 630, 649 (S.D. Ohio 2015).

While Plaintiffs have not provided extensive expert testimony on the issue of causation, they have provided sufficient evidence and testimony to create a genuine issue of material fact as to whether off-gassing formaldehyde caused their injuries. Moreover, regarding past pain and suffering damages, "since they are subjective feelings," they may be proven by lay testimony. *Keller v. Chism*, 2019-Ohio-1714, 136 N.E.3d 27. Moreover, there exists "[n]o requirement [] that a party must offer epidemiological evidence to establish causation. Plaintiffs' burden of establishing causation does not necessarily require them to produce scientific studies[.]" *In re Meridia Prod. Liab. Litig.*, 328 F. Supp. 2d 791 (N.D. Ohio 2004), *aff'd sub nom. Meridia Prod. Liab. Litig. v. Abbott Lab'ys*, 447 F.3d 861 (6th Cir. 2006).

As a general matter, "rejection of expert testimony is the exception, rather than the rule." *In re Scrap Metal*, 527 F.3d at 530. And, while "[t]otal failure to show that the defect caused or contributed to the accident will foreclose as a matter of law a finding of strict products liability[,]" where a plaintiff can show sufficient evidence to create a genuine issue of material fact as to causation, summary judgment is inappropriate. *Stark v. Armstrong World Indus., Inc.*, 21 F. App'x 371 (6th Cir. 2001). Accordingly, this Court finds Plaintiffs have created a sufficient genuine issue of material fact as to medical causation, which precludes summary judgment for Weyerhaeuser on both Plaintiffs' design defect and failure to warn claims. Weyerhaeuser is **DENIED** summary judgment on these claims.

## V. CONCLUSION

Pursuant to the foregoing analysis, Westport's and Weyerhaeuser's Motions for Summary Judgment (ECF Nos. 91, 110) are **GRANTED in part and DENIED in part**. BluSky's Motion

for Summary Judgment (ECF No. 111) is **DISMISSED**. Furthermore, the parties' Motions to Exclude (ECF Nos. 101–106, 113–116) are all **DENIED**.

      **IT IS SO ORDERED.**

                                        **ALGENON L. MARBLEY**
                                        **CHIEF UNITED STATES DISTRICT JUDGE**

**DATED: September 12, 2022**